# FINANCIAL SERVICES AGREEMENT

AMONG

PNC BANK, F.S.B.,

INDEPENDENT FINANCIAL SERVICES, INC.

AND

IFS MORTGAGE SERVICES, LLC

FEBRUARY 27, 1998

# TABLE OF CONTENTS


| | Tab Number |
|---|---|
| Financial Services Agreement | 1 |
| Gold Program Agreement | 2 |
| Platinum Program Agreement | 3 |
| Convertible Line of Credit Note and Resolutions | 4 |
| Exclusive Endorsement Agreement with AMS | 5 |
| RESPA Letter from Peabody & Brown | 6 |
| AMS Interpretive Letter from Peabody & Brown | 7 |
| Alabama Letter from PNC | 8 |

# FINANCIAL SERVICES AGREEMENT

THIS AGREEMENT ("Agreement"), dated as of February 27, 1998, is among PNC BANK, F.S.B., a federal saving bank having its principal place of business in Pittsburgh, Pennsylvania ("PNC"), INDEPENDENT FINANCIAL SERVICES, INC., a Connecticut corporation having its principal place of business in Westerly, Rhode Island ("IFSI"), and IFS MORTGAGE SERVICES LLC, INC., a Delaware limited liability company having its principal place of business in Westerly, Rhode Island ("IFSMS"). For purposes of this Agreement, IFSI and IFSMS are collectively referred to herein as "IFS".

WITNESSETH:

WHEREAS, PNC and IFS wish to make available to independent insurance agencies through a program offered by IFS, currently known as "The Independent Advantage Loan Program", certain of PNC's financial products and services in order for Agencies to offer such products and services to their clients.

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, and intending to be legally bound, the Parties hereby agree as follows:

## Section 1.

## Definitions

For purposes of this Agreement, the following terms shall have the meanings set forth below:

Section 1.1 "Account in Good Standing" shall mean (i) a loan which is less than thirty (30) days delinquent and not otherwise in default at the end of a given calendar month and (ii) a line of credit which is less than thirty (30) days delinquent and not otherwise in default at its billing cycle date during a given calendar month. In addition, an "Account in Good Standing" shall mean a loan or line of credit which is not classified by PNC as (i) a fraud account, (ii) a bankrupt account, (iii) a charged-off account or (iv) a closed account.

Section 1.2 "Additional Term" shall mean any five (5) year period of extension or renewal of this Agreement established after the Initial Term pursuant to Section 10.1(b) of this Agreement.

Section 1.3 "Affiliate", when used with reference to any Person, shall mean any other Person controlling, controlled by, or under common control with such Person. For purposes of this section, "control" means the direct or indirect ownership or control of, or power to vote, 25% or more of any class of stock of another Person.

Section 1.4 "Agency" shall mean an independent insurance agency or carrier which enters into an Agency Agreement in order to participate in the Program.

Section 1.5 "Agency Agreements" shall mean the agreements entered into by and between an Agency and IFS as decribed in Section 2.4.

Section 1.6 "Agreement" shall mean this agreement, including all exhibits and schedules hereto, as the same may be amended or supplemented from time to time.

Section 1.7 "AMS System" shall have the meaning provided for in Section 2.2.

Section 1.8 "Applicable Law" shall mean any requirement of law, rule, regulation, policy statement or regulatory bulletin enacted, promulgated or issued by any governmental entity, whether federal, state or local, and the rules and regulations of any applicable card association, in each case applicable to or binding upon a Party or any provider of any Service pursuant to this Agreement.

Section 1.9 "Business Day" shall mean any day that is not a Saturday, Sunday, legal holiday or other day on which PNC, IFSI or IFSMS are authorized or obligated by law or executive order to close.

Section 1.10 "Change in Control", when used with reference to any Person, shall mean the reorganization, merger or consolidation of such Person or its parent corporation, in which the shareholders of such Person or its parent corporation immediately before such event will not immediately thereafter own more than fifty percent (50%) of the combined voting power entitled to vote in the election of directors of the reorganized, merged or consolidated entity.

Section 1.11 "Confidential Information" shall mean this Agreement and any non-public information which has been provided by one Party to the other, jointly obtained by the Parties, or developed by the Parties in connection with the Program.

Section 1.12 "Effective Date" shall be February 27, 1998.

Section 1.13 "Escrow Account" shall have the meaning provided for in Section 9.3(a).

Section 1.14 "Escrow Deficiency" shall have the meaning provided for in Section 9.3(b).

Section 1.15 "IFS System" shall have the meaning provided for in Section 2.2.

Section 1.16 "Indemnified Party" shall have the meaning provided for in Section 9.2(a).

Section 1.17 "Indemnifying Party" shall have the meaning provided for in Section 9.2(a).

Section 1.18 "Initial Term" shall mean the original ten (10) year term of this Agreement as set forth in Section 10.1(a).

Section 1.19 "IFS Marks" shall have the meaning set forth in Section 4.2.

Section 1.20 "Parties" shall mean PNC, IFSI and IFSMS.

Section 1.21 "Person" shall mean any natural person, partnership, corporation, limited liability company, joint venture, or other entity of any kind and any government, including any agency, political subdivision or instrumentality of any government.

Section 1.22 "Pilot" shall have the meaning set forth in Section 2.1.

Section 1.23 "Pilot Period" shall mean the six (6) month period set forth in Section 2.1.

Section 1.24 "PNC Marks" shall have the meaning set forth in Section 4.1.

Section 1.25 "PNC Mortgage" means PNC Mortgage Corp. of America, which is an Affiliate of PNC.

Section 1.26 "Pre-existing Agreements" shall have the meaning provided for in Section 2.1.

Section 1.27 "Program" shall mean the offering and providing of the Services through Agencies to their clients through the IFS System and the AMS System in accordance with this Agreement;

Section 1.28 "ROA" shall mean PNC's return on assets on the Program as determined, in general, in accordance with generally accepted accounting principles, regulatory accounting principles, and PNC's normal and customary accounting methodologies, and determined, specifically, as follows: PNC's net income on the Program, after direct and overhead expenses and applicable income taxes incurred by PNC on the Program (for a given period of time, annualized), divided by total assets generated by PNC on the Program for the same period. Total assets includes loan outstandings and other related assets (e.g. loans in process, equipment, etc.) generated as a direct or indirect result of the Program.

Section 1.29 "Services" shall mean the exclusive services to be provided through the Program pursuant to Section 2.1.

Section 1.30 "Term" shall mean the period which includes the Initial Term, together with any Additional Term or other extension of this Agreement.

Section 1.31 "Third Party" shall mean any Person other than the Parties or the Affiliates of the Parties.

## Section 2.

## The Program

Section 2.1 In General

(a) PNC and its Affiliates will make available, or cause one or more of its Third Party providers to make available, a menu of Services to Agencies to sell to their clients under the general categories listed in Exhibit A (the "Services"). In addition, from time to time during the Term, PNC may offer other products and services with the written consent of IFS and, in such case, such other products and services will be deemed to be within the definition of "Services" for purposes of this Agreement. All Services (including any other products or services offered pursuant to the Program) are subject to the exclusivity provisions contained in Section 2.3. In the event IFS has any agreements with other financial institutions to offer any similar or competing products or services ("Pre-existing Agreements"), IFS will terminate those Pre-existing Agreements in accordance with their terms and in a manner that would avoid early termination penalties as soon as possible after the products and services offered under those Pre-existing Agreements are available under the Program.

(b) PNC and IFS agree that the Program will initially be offered on a test basis (the "Pilot") to Agencies for a period of six (6) months from the Effective Date of this Agreement, unless a shorter period is mutually agreed upon by the Parties (the "Pilot Period"). IFS and PNC will work together in good faith to determine which Agencies are included in the Pilot and which Services will be offered to Agencies during the Pilot Period. During the Pilot Period, PNC shall review and analyze the results of the Pilot, and PNC will share its analysis with IFS except as prohibited by Applicable Law. In the event the results of the Pilot are unsatisfactory to either PNC or IFS, the Parties agree to cooperate and work together to determine and implement any mutually agreed upon corrective action relating to operational aspects of the Program. After the Pilot Period, the Parties will work together in good faith to determine an appropriate rollout schedule to offer the Program and the Services to other independent insurance agencies, it being the desire of the Parties that the Program to be offered to as many independent insurance agencies as possible, while at all times being offered in a manner consistent with PNC's and IFS' ability to properly administer the Program.

(c) Subject to the terms of this Agreement, IFS and PNC will enthusiastically promote the Program to independent insurance agencies and enthusiastically encourage independent insurance agencies to join, participate in and take advantage of the Program and proactively offer the Services to their clients.

Section 2.2 Distribution Channel

During the Term of this Agreement, IFS will cause the Services to be offered to Agencies through a software system currently known as "The IFS Independent Advantage Program" (the "IFS System") interfaced with rating and backroom software provided and maintained by AMS Services, Inc. ("AMS") (the "AMS System"). IFS will maintain the IFS System during the Term. PNC will maintain its loan system interface with the IFS System during the Term.

IFS has entered into a contractual arrangement with AMS to permit the Program to be offered through the AMS System, to require AMS to maintain the interface system with the IFS System, and to prevent the usage of the AMS System by any other Person for the purpose of providing products and services which compete with the Services. A copy of IFS' agreement with AMS is attached hereto as Exhibit B. IFS agrees that (i) it will not terminate its agreement with AMS without the prior written consent of PNC, (ii) it will not assign its agreement with AMS to any Person without the prior written consent of PNC, and (iii) it will not amend, modify, supplement or otherwise make any substantive changes to its agreement with AMS without the prior written consent of PNC. IFS will maintain its agreement with AMS and will at all times enforce its agreement with AMS to cause AMS to maintain the AMS System with IFS and PNC in order to offer and provide the Services in the Program to and from the Agencies' locations. IFS will notify PNC in writing as promptly as possible if a default occurs, or if an event occurs which would lead to a default, under its agreement with AMS. While the Parties desire that all Services be provided through the AMS System, IFS acknowledges and agrees that system functionality constraints and/or compliance with Applicable Law may require loan documentation and loan disclosures for certain Services to be delivered by PNC outside of the interface system with the approval of IFS, not to be unreasonably withheld.

Section 2.3 Exclusivity

Except for any Pre-existing Agreements which are to be terminated pursuant to Section 2.1 above, IFS agrees that PNC shall have the exclusive right to offer and provide the Services to Agencies (whether through the IFS System, AMS System or otherwise) and will not endorse, engage or contract with, or permit any Affiliate to endorse, engage or contract with, any Third Party to provide Services. In addition, and except for any Persons which are parties to Pre-existing Agreements which are to be terminated pursuant to Section 2.1 above, IFS will not permit any other Person to use the IFS System or any system interface with Agencies for the purpose of providing competing loan products or services.

Section 2.4 Participation by Agents

IFS will seek to obtain participation by independent insurance agencies in the Program in accordance with Section 2.1 above and Section 3.1 below. Prior to any independent insurance agency's participation in the Program and any offering of the Services to the independent

insurance agency and its clients, IFS will cause each independent insurance agency to execute the agreements with IFS in the form, without substantive alteration, of Exhibit C attached hereto ("Agency Agreements"). IFS will use its best efforts to at all times monitor and enforce the obligations of Agencies under the Agency Agreements, including but not limited to the obligations relating to (i) the exclusivity of IFS in the offering of the Services, (ii) the minimum responsibilities for offering real-estate secured Services, (iii) the obtaining all licenses required by Applicable Law in order to offer the Services to clients and be compensated therefor, and (iv) the restrictions against Agencies including insurance premiums unrelated to the loan in the financing of any loan. IFS will suspend or terminate any Agency's participation in the Program if the Agency is in material breach of an Agency Agreement. IFS will also immediately terminate any Agency's participation in the Program in the event that it believes that (i) the Agency commits, attempts to commit or conspires to commit fraud, (ii) the Agency misrepresents the Program or the terms of any Service to a client, (iii) the Agency fails to be properly licensed to offer the Services or to be compensated therefor under Applicable Law, (iv) the Agency fails to meet its responsibilities under training or operating manuals or procedures provided to it pursuant to the Program, or (v) the Agency repeatedly engages in conduct which is deemed by PNC to be injurious to PNC's providing or administration of the Services. While the Parties desire that the Services be provided to Agencies on a nationwide basis, IFS agrees that it will not offer or continue to offer the Program to Agencies located in a given jurisdiction should PNC determine in good faith that offering the Services in such jurisdiction would subject PNC to an unacceptable level of legal risk and advise IFS in writing of such determination.

IFS will maintain an orderly inventory of copies of all Agency Agreements, and IFS shall permit PNC, upon 2 Business Days advance notice, to audit IFS' inventory of such Agency Agreements, which audit may be performed by PNC from time to time during IFS' regular business hours. At PNC's request, IFS will provide copies of all Agency Agreements to PNC at PNC's expense.

Section 2.5 Ownership of Accounts; Product Pricing; Credit Decisioning

All accounts booked by PNC under the Program and all receivables related thereto shall be owned solely by PNC. PNC shall have full and unfettered rights in and to the accounts and the receivables related thereto, including, without limitation, the right to sell, transfer, securitize or otherwise dispose in any manner the accounts and receivables related thereto. PNC shall also have the right to have Third Parties provide services in connection with the administration of the accounts, provided that each Third Party agrees to confidentiality provisions substantially similar to those contained in Section 8 of this Agreement.

PNC shall decide, in its sole discretion, the specific underwriting and pricing terms and conditions of any of the Services offered. In addition, IFS acknowledges and agrees that PNC's pricing may vary by market and may vary by loan based upon a given applicant's credit profile. PNC will notify IFS of changes in principal product features at least thirty (30) days in advance of such changes. (The foregoing sentence shall not apply to pricing changes which occur due to increases or decreases in an index used on Services with variable interest rates.) PNC agrees,

however, that its pricing for loan Services (other than credit card lines, first mortgage loans and automobile leases) customarily known in the banking industry as "A" grade credits will be competitive with "Second Quartile" pricing as determined by BISYS Research (or a similar third party research firm) on a quarterly basis. In addition, PNC agrees to provide IFS with a risk matrix generally identifying its credit grade parameters to illustrate creditworthiness thresholds for credit extensions on appropriate Services considered to be "A", "B", "C" or "D" grade credits. The Parties agree that PNC is not obligated to extend credit on such Services on "B", "C" and "D" grade credits unless PNC has a contractual arrangement to sell, transfer or convey such loans to a Third Party funding source acceptable to PNC. PNC agrees to make good faith efforts to locate and establish an arrangement with a Third Party funding source acceptable to it.

Section 2.6 Cross-Selling of Other Products and Services

PNC shall have the right to offer products and services other than the Services through the Program only with the written approval of IFS and subject to agreement with IFS as to compensation to be paid to IFS for such other products and services. Notwithstanding the foregoing sentence, IFS agrees that PNC may offer the following without restriction: (i) credit insurance, and home and vehicle service contracts and simliar products, in connection with the Services, provided such insurance, contracts and other similar products are offered through the Program, (ii) miscellaneous goods or services customarily offered in connection with credit card accounts, provided that such goods or services are offered to PNC's credit card customer base in general, and (iii) value-added features on credit card accounts, including various types of insurance coverages, provided by Visa, MasterCard, or any other credit card association.

Section 2.7 First Mortgage Loans

PNC shall cause PNC Mortgage to enter into good faith negotiations with IFSMS for IFSMS' participation in the PNC Mortgage "Correspondent Lender Program". Under such program, PNC Mortgage purchases first lien residential mortgage loans on a servicing-released basis from lenders. The participation of IFSMS in such program shall be conditioned upon, among other things, the following: (i) satisfaction by IFSMS of all eligibility requirements set forth in PNC Mortgage's "Purchase Programs Seller Guide", (ii) the qualification of IFSMS to do business under the laws of each state in which IFSMS does business and the compliance by IFSMS with all of the laws of each state applicable to first lien residential mortgage lending, (iii) the execution by IFSMS of the PNC Mortgage form of correspondent agreement, and (iv) the good standing by IFSMS with each of the following mortgage agencies with which IFSMS does business: the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation, the Government National Mortgage Association, and the Department of Housing and Urban Development.

## Section 3.

## Marketing

Section 3.1 Marketing to Agents

IFS will market and promote the Program to independent insurance agencies and will communicate all aspects of the Program to Agencies. IFS will also be responsible for educating Agencies about the Services and the operational aspects of the Program. All costs related to the foregoing will be borne by IFS. PNC, at its sole cost, shall supply IFS with necessary training and/or operating manuals or procedures relating to the Services for IFS' distribution to Agencies.

Section 3.2 Approval of Materials

Each Party shall have the right to review and approve the form and content of any materials and any other communications developed by any other Party to Agencies and their clients in connection with the Program. This right of review and approval will not, however, apply to PNC's standard loan documentation, customary communications with its customers in general, or standard marketing materials or portions thereof which describe the Services and the terms thereof. Each Party's right of prior approval shall not be unreasonably withheld or delayed.

## Section 4.

## Grant of License and Use of Names

Section 4.1 Grant by PNC

During the term of this Agreement, PNC hereby grants to IFS a non-exclusive license to use the name, logos, trademarks, service marks and other corporate identification materials of PNC (the "PNC Marks") in connection with this Agreement and to the extent reasonably necessary to the performance by IFS of the transactions contemplated hereby; provided, however, that IFS shall not use the PNC Marks without PNC's prior consent and shall submit to PNC for prior approval copies of any proposed materials in which the PNC Marks are to be used, which approval shall not be unreasonably withheld. IFS agrees that it does not have and by reason of this Agreement shall not acquire any proprietary right or rights in or to the PNC Marks. IFS agrees not to use the PNC Marks in any way which would disparage PNC, be injurious to PNC's reputation, or cause PNC to lose goodwill.

Section 4.2 Grant by IFS

During the term of this Agreement, IFS hereby grants to PNC a non-exclusive license to use the name, logos, trademarks, service marks and other corporate identification materials of IFS (the "IFS Marks") in connection with this Agreement and to the extent reasonably necessary to

the performance by PNC of the transactions contemplated hereby; provided, however, that PNC shall not use the IFS Marks without IFS's prior consent and shall submit to IFS for prior approval copies of any proposed materials in which the IFS Marks are to be used, which approval shall not be unreasonably withheld. PNC agrees that it does not have and by reason of this Agreement shall not acquire any proprietary right or rights in or to the IFS Marks. PNC agrees not to use the IFS Marks in any way which would disparage IFS, be injurious to IFS's reputation, or cause IFS to lose goodwill.

Section 4.3 Remedy in Event of Breach

The Parties each acknowledge that money damages alone may be inadequate to compensate the other Party for any breach of the license provisions under this Section 4. Therefore, in the event of such a breach, either Party may, in addition to any other rights or remedies available at law, obtain and enforce equitable relief prohibiting the breach or compelling specific performance.

**Section 5.**

**Covenants of the Parties**

Section 5.1 Mutual Covenant

Subject to the terms of this Agreement, each Party shall fully cooperate with the other Party in furnishing any information or performing any action reasonably requested by that Party, which information or action is necessary to the timely and successful consummation of the tranactions contemplated by this Agreement.

Section 5.2 Covenants of PNC

(a) PNC shall assure that its loan documentation and loan disclosures for the Services offered by it under the Program are in compliance with Applicable Law. PNC shall not be obligated to offer any Service or pay compensation thereon to IFS to the extent that the offering of such Services or the payment of compensation thereon would be prohibited by Applicable Law. In such case, such Service shall be removed from the Program at the written request of IFS.

(b) As to in-bound calls to PNC, PNC shall establish a 24-hour, seven day, dedicated toll free number for Agency clients to obtain automated information about their accounts with PNC for new automobile loans, used automobile loans, home equity loans, home equity lines of credit, personal unsecured lines of credit, and automobile leases when such Services established on PNC's books under the Program exceed $300,000,000.00 in assets. PNC shall also seek to establish a voice recognition unit which will identify the phone line as part of "The Independent Advantage Loan Program". As to out-bound calls from PNC for such loans, lines of credit and leases, PNC shall identify the call as being part of "The Independent Advantage Program".

(c) PNC shall be responsible for all Service terms and pricing. PNC shall perform all services required in connection with the granting of credit privileges. In performing these obligations, PNC, in its sole discretion, shall have the sole right to approve or disapprove any application for a loan account.

(d) During the Term, PNC agrees not to enter into a program substantially similar to the Program with any other Person that maintains, as its primary business activity, direct business relationships with the Agencies participating in the Program.

(e) During the Term, PNC shall maintain sufficient levels of capital to meet minimum requirements for a "Well Capitalized" bank as of the end of each calendar quarter, as defined from time to time by Applicable Law.

(f) PNC shall use the IFS Marks on marketing and advertising materials related to the Program.

(g) PNC agrees to provide a digest of loan broker licensing laws for each of the fifty states. IFS agrees to use such digest as a guide only and acknowledges and agrees that PNC makes no representations or warranties whatsoever as to the accuracy or completeness of the digest.

Section 5.3 Covenants of IFS

(a) IFS shall use its best efforts to ensure that Agency client information and loan documentation can be transmitted to and from participating Agencies to PNC during PNC's normal business hours of 9AM to 5PM in all U.S. time zones, Monday throught Friday.

(b) IFS shall use its best efforts to ensure that all Agencies participating in the Program have obtained and maintain all licenses, permits, and other governmental authorizations to offer the Services and receive compensation therefor. IFS will not permit any Agency to participate in the Program or offer Services through the IFS System or AMS System unless it has received a copy of that Agency's license in jurisdictions where required. IFS will monitor the expiration dates for such licenses and obtain evidence of license renewals. IFS will maintain an orderly inventory of copies of licenses of all Agencies required to be licensed under Applicable Law to offer the Services to their clients, and IFS shall permit PNC to audit IFS' inventory of such licenses, which audit may be performed by PNC from time to time during IFS' regular business hours.

(c) IFS shall pay all compensation to the Agencies pursuant to the Agency Agreements not later than ten (10) Business Days after its receipt of compensation from PNC pursuant to Section 6.2 below. PNC shall have no responsibility or liability for any payment obligations of IFS to Agencies or AMS.

(d) IFS shall obtain all licenses, permits, and other governmental authorizations required by a jurisdiction prior to doing business in such jurisdiction.

## Section 6.

## Payment for Services and Draw Arrangement

Section 6.1 Compensation

As full compensation to IFSI and IFSMS, except as otherwise provided in Section 6.3 and Section 9.3(b) below, PNC shall pay, on a monthly basis, to IFSI an amount equal to the following:

(i) a system network fee in the amount of (a) $1.25 times (b) the number of new automobile loans, used automobile loans, home equity loans, home equity lines of credit, personal unsecured loans, personal unsecured lines of credit, and automobile leases (but specifically excluding credit card lines and first mortgage loans) established on PNC's books (or a Third Party's books) pursuant to the Program which have an outstanding balance thereon on PNC's books (or a Third Party's books) at the end of a given month and are Accounts in Good Standing; and

(ii) one hundred dollars ($100.00) for each new automobile loan, used automobile loan, home equity loan, home equity line of credit, and automobile lease (but specifically excluding first mortgage loans) which is established on PNC's books pursuant to the Program throughout a given month; twenty-five dollars ($25.00) for each personal unsecured loan and personal unsecured line of credit (but specifically excluding credit card lines) which is established on PNC's books pursuant to the Program throughout a given month; ten dollars ($10.00) for each credit card line originated by PNC or its Affiliates and established on their books pursuant to the Program throughout a given month; and two dollars ($2.00) for each credit card line originated by PNC or its Affiliates and established on their books pursuant to distribution channels other than through the Program using IFS-provided client lists throughout a given month.

For purposes of this Section 6, the Parties agree that a loan which is subject to a right of rescission under the federal Truth in Lending Act and Regulation Z promulgated by Federal Reserve Board is not "established on PNC's books" until the rescission period applicable to such loan has expired. PNC and IFS agree to review the compensation schedule contained in this Section 6.1 on an annual basis to confirm that the assumptions of the Parties used to determine the system network fee accurately reflect actual experience and consider making mutually agreed upon adjustments thereto.

Section 6.2 Payment of Fees and Reporting

PNC shall pay appropriate compensation no later than the 15th Business Day following the last day of each calendar month. Concurrent with such payment, PNC shall provide IFS with a report, in a format to be mutually agreed upon, detailing PNC's calculation of compensation to IFS and providing a breakdown, by Agency, of loans established on PNC's books during the monthly period.

Section 6.3 Draw Arrangement

PNC will extend to IFS a one-year non-revolving line of credit/three-year amortizing term loan in an amount not to exceed Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00). The line of credit/term loan will be evidenced by IFS' execution and delivery to PNC of a convertible line of credit note in the form of Exhibit D attached hereto. The line of credit/term loan will accrue interest at the "prime rate" of interest specified in the convertible line of credit note, and will be due and payable in full on the date which is four (4) years from the date of the convertible line of credit note. IFS shall use the proceeds of such line of credit/term loan for the purpose of advancing the Program contemplated by this Agreement and shall therefore only use amounts drawn on the line of credit for corporate purposes related thereto. Each requested draw by IFS under the line of credit will be accompanied by such documentation evidencing IFS' use of the draw as PNC may reasonably request. In addition, at the time IFS expends any requested draw, IFS shall also expend an amount equal to such draw out of its own funds for such corporate purposes. IFS will provide PNC with such documentation evidencing IFS' expenditure of its own funds as PNC may reasonably require. Notwithstanding anything contained in this Section 6 to the contrary, any and all amounts payable by PNC (net of payments by IFS to Agencies and AMS) to IFS under Section 6 for a given month which exceed $30,000.00 shall be applied by PNC in payment of the convertible line of credit note and shall not be paid to IFS until the line of credit agreement note is paid in full; provided, however, that under no circumstances may PNC apply more than $10,000.00 in payment of the convertible line of credit note in a given month. Any such payments shall be applied among principal and interest on the convertible line of credit note in PNC's discretion.

## Section 7.

## Representations and Warranties

Section 7.1 Representations and Warranties of PNC.

PNC represents and warrants to IFS as follows:

(a) PNC is a duly organized federal savings association, validly existing and in good standing under the laws of the United States of America. PNC has full corporate power and authority to carry on its business as it is now being conducted and to own and operate its properties and assets, and is duly qualified to do business in each state where the conduct of its

business requires such qualification and where failure to so quality would have a material adverse effect on its operations. PNC has all federal, state, and local authorizations and licenses necessary for it to carry on its business as it is now being conducted, and as contemplated by the Agreement, except for the absence of any authorizations and licenses which would not have any material adverse effect on the business, operations or financial condition of PNC or the Program.

(b) PNC has all requisite corporate power and authority to enter into, adopt and perform all of its obligations under this Agreement. The execution, adoption and delivery of this Agreement, have been duly and validly authorized by all necessary corporate action on the part of PNC, and upon execution and delivery by the other Parties hereto, this Agreement will constitute a legal, valid and binding obligation of PNC, enforceable against it in accordance with its terms, subject as to enforceability, to bankruptcy, insolvency, conservatorship, receivership and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c) Neither the execution, adoption and delivery of this Agreement, nor compliance by PNC with any of the provisions hereof shall (i) conflict with or result in a breach of any provision of PNC's Charter or bylaws; (ii) constitute or result in a breach of any term, condition or provision of, constitute a default under, or give rise to any right of termination pursuant to any license, agreement, or other instrument or obligation binding upon PNC which would have a material adverse effect on the business, operations or financial condition of PNC; or (iii) violate any judgment, order, writ, injunction, decree binding upon or affecting PNC, or any provision of Applicable Law.

(d) No consents or approvals of or filings or registrations with any public body or authority or any third party are necessary in connection with the execution and delivery of this Agreement by PNC, or in connection with PNC's compliance with the provisions hereof.

(e) There are no actions, suits, claims, governmental investigations or proceedings instituted, pending or, to the knowledge of PNC, threatened against PNC or against any asset, interest or right of PNC, that would, if determined adversely to PNC, have a materially adverse affect on the ability of PNC to perform its obligations under this Agreement, or the transactions contemplated hereby.

(f) All databases, input and output formats, computer systems and software owned or licensed to be used by PNC and used in connection with the Program do not in any way infringe upon or interfere with the proprietary rights of a Third Party.

(g) PNC is the owner of the PNC Marks and has the authority to grant the license granted to IFS pursuant to Section 4.1 to use the PNC Marks, and the PNC Marks do not infringe upon the copyright, trademark or proprietary rights of any Third Party.

Section 7.2 Representations and Warranties of IFSI.

IFSI represents and warrants to PNC as follows:

(a) IFSI is a duly organized corporation, validly existing and in good standing under the laws of the State of Connecticut. IFSI has full corporate power and authority to carry on its business as it is now being conducted and to own and operate its properties and assets, and is duly qualified to do business in each state where the conduct of its business requires such qualification and where failure to so qualify would have a material adverse effect on its operations. IFSI has all federal, state, and local authorizations and licenses necessary for it to carry on its business as it is now being conducted, and as contemplated by the Agreement, except for the absence of any authorizations and licenses which would not have any material adverse effect on the business, operations or financial condition.

(b) IFSI has all requisite corporate power and authority to enter into, adopt and perform all of its obligations under this Agreement. The execution, adoption and delivery of this Agreement have been duly and validly authorized by all necessary corporate action on the part of IFSI, and upon execution and delivery by PNC, this Agreement will constitute a legal, valid and binding obligation of IFSI, enforceable against it in accordance with its terms, subject as to enforceability, to bankruptcy, insolvency and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c) Neither the execution, adoption and delivery of this Agreement, nor compliance by IFSI with any of the provisions hereof shall (i) conflict with or result in a breach of any provision of IFSI's Articles of Incorporation or bylaws; (ii) constitute or result in a breach of any term, condition or provision of, constitute a default under, or give rise to any right of termination pursuant to any license, agreement, or other instrument or obligation binding upon IFSI which would have a material adverse effect on the business, operations or financial condition of IFSI; or (iii) violate any judgment, order, writ, injunction, decree binding upon or affecting IFSI, or any provision of Applicable Law.

(d) Except for licenses, permits and authorizations which IFSI will obtain in accordance with Section 5.3(d) above, no consents or approvals of or filings or registrations with any public body or authority or any Third Party are necessary in connection with the execution and delivery of this Agreement by IFSI, or in connection with IFSI's compliance with the provisions hereof.

(e) There are no actions, suits, claims, governmental investigations or proceedings instituted, pending or, to the knowledge of IFSI, threatened against IFSI or against any asset, interest or right of IFSI, that would, if determined adversely to IFSI, have a material adverse effect on IFSI or would materially adversely affect the ability of IFSI to perform its obligations under this Agreement, or the transactions contemplated hereby.

(f) All databases, input and output formats, computer systems and software owned or licensed to be used by IFSI and used in connection with the Program do not in any way infringe upon or interfere with the proprietary rights of a Third Party.

(g) IFSI and/or IFSMS is the owner of the IFS Marks and has the authority to grant the license granted to PNC pursuant to Section 4.2 to use the IFS Marks, and the IFS Marks do not infringe upon the copyright, trademark or proprietary rights of any Third Party.

(h) As of the date of this Agreement, the agreement between IFS and AMS described in Section 2.2 is in full force and effect and no defaults exist under the terms of that agreement.

Section 7.3 Representations and Warranties of IFSMS.

IFSMS represents and warrants to PNC as follows:

(a) IFSMS is a duly organized limited liability company, validly existing and in good standing under the laws of the State of Delaware. IFSMS has full corporate power and authority to carry on its business as it is now being conducted and to own and operate its properties and assets, and is duly qualified to do business in each state where the conduct of its business requires such qualification and where failure to so qualify would have a material adverse effect on its operations. IFSMS has all federal, state, and local authorizations and licenses necessary for it to carry on its business as it is now being conducted, and as contemplated by the Agreement, except for the absence of any authorizations and licenses which would not have any material adverse effect on the business, operations or financial condition.

(b) IFSMS has all requisite corporate power and authority to enter into, adopt and perform all of its obligations under this Agreement. The execution, adoption and delivery of this Agreement have been duly and validly authorized by all necessary corporate action on the part of IFSMS, and upon execution and delivery by PNC, this Agreement will constitute a legal, valid and binding obligation of IFSMS, enforceable against it in accordance with its terms, subject as to enforceability, to bankruptcy, insolvency and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c) Neither the execution, adoption and delivery of this Agreement, nor compliance by IFSMS with any of the provisions hereof shall (i) conflict with or result in a breach of any provision of IFSMS' Articles of Incorporation or bylaws; (ii) constitute or result in a breach of any term, condition or provision of, constitute a default under, or give rise to any right of termination pursuant to any license, agreement, or other instrument or obligation binding upon IFSMS which would have a material adverse effect on the business, operations or financial condition of IFSMS; or (iii) violate any judgment, order, writ, injunction, decree binding upon or affecting IFSMS, or any provision of Applicable Law.

(d) Except for licenses, permits and authorizations which IFSMS will obtain in accordance with Section 5.3(d) above, no consents or approvals of or filings or registrations with

any public body or authority or any Third Party are necessary in connection with the execution and delivery of this Agreement by IFSMS, or in connection with IFSMS' compliance with the provisions hereof.

(e) There are no actions, suits, claims, governmental investigations or proceedings instituted, pending or, to the knowledge of IFSMS, threatened against IFSMS or against any asset, interest or right of IFSMS, that would, if determined adversely to IFSMS, have a material adverse effect on IFSMS or would materially adversely affect the ability of IFSMS to perform its obligations under this Agreement, or the transactions contemplated hereby.

(f) All databases, input and output formats, computer systems and software owned or licensed to be used by IFSMS and used in connection with the Program do not in any way infringe upon or interfere with the proprietary rights of a Third Party.

(g) IFSI and/or IFSMS is the owner of the IFS Marks and has the authority to grant the license granted to PNC pursuant to Section 4.2 to use the IFS Marks, and the IFS Marks do not infringe upon the copyright, trademark or proprietary rights of any Third Party.

(h) As of the date of this Agreement, the agreement between IFS and AMS described in Section 2.2 is in full force and effect and no defaults exist under the terms of that agreement.

**Section 8.**

**Confidential Information**

Section 8.1. Maintenance of Confidentiality.

(a) Use of Confidential Information. Each Party agrees that Confidential Information provided under this Agreement will be held and treated by it, its Affiliates, agents, employees and representatives in the strictest confidence. Without limiting the generality of the foregoing, the Parties each agree:

(i) not to disclose or permit any Third Party access to the Confidential Information, except that disclosure or access shall be permitted to an employee, officer, director, agent, representative, external or internal auditor, independent contractor, VISA or MasterCard, or any regulatory authority of the Party requiring access to the Confidential Information, provided that such Person is advised of the confidential nature of the Confidential Information, and is instructed to maintain the confidentiality of such Confidential Information;

(ii) not to use or permit any Third Party to use the Confidential Information for any purpose other than in connection with the Program;

(iii) to establish and maintain commercially reasonable controls to ensure the confidentiality of the Confidential Information (including in particular information with respect to Agencies' clients and their accounts) and that any such Confidential Information is not disclosed or otherwise used for the benefit of any Third Party; and

(iv) to notify the other Parties promptly and in writing of the circumstances surrounding any possession, use or knowledge of the Confidential Information by any Person other than those authorized by this Agreement.

Section 8.2. Return or Destruction of Confidential Information on Termination.

Upon termination of this Agreement, each party shall return any Confidential Information provided by the other and not retain copies of any Confidential Information.

Section 8.3. Exclusions.

Nothing in this Section 8 shall restrict any Party with respect to any Confidential Information, or information identical or similar thereto, which (a) that Party rightfully possessed before it received the information from the other Party; (b) becomes or has become publicly available through no fault of that Party; (c) is subsequently furnished to that Party by a Third Party not known to be under restrictions on use or disclosure; (d) is independently developed by an employee, agent or contractor of such Party; (e) is required to be disclosed by law, regulation or court order (provided, that the disclosing Party shall have exercised reasonable efforts to notify the other Party prior to disclosure); or (f) is disclosed in any proceeding to enforce a Party's rights under this Agreement, provided, that all reasonable measures to preserve the confidentiality of such information in any such proceeding are taken by such Party. In addition, nothing in this Section 8 shall restrict PNC from disclosing or furnishing to a Third Party any information, including Confidential Information, which is deemed by PNC to be necessary to disclose or furnish in order to sell, transfer or securitize loan accounts and/or receivables thereon, provided that each such Third Party shall agree to keep such information confidential under terms consistent with the terms contained in this Section 8.

Section 8.4. Remedy in Event of Breach.

In the event of any breach of the Section 8, the Parties agree that the non-breaching Party will suffer irreparable harm and the total amount of monetary damages for any such harm may be impossible to calculate and will therefore be an inadequate remedy. Accordingly, the Parties agree that the non-breaching Party shall be entitled to temporary and permanent injunctive relief against the breaching Party, its employees, officers, directors, agents, representatives, external or internal auditors, or independent contractors, and the other rights and remedies to which the non-breaching Party may be entitled at law, in equity and under this Agreement for any violation of this Section 8.

## Section 9.

## Indemnification

Section 9.1 Scope

(a) PNC's Indemnification. Subject to the limitations set forth herein, PNC shall indemnify and hold harmless IFS and their respective directors, officers and employees for all losses, expenses and costs, including but not limited to, reasonable attorneys fees, judgments, penalties and other payments in settlement or other disposition, in connection with any claims, suits or proceedings made or brought by a Third Party relating to the Program to the extent that such losses, expenses and costs result from, arise out of, or relate to (i) the gross negligence or willful misconduct of PNC or its Affiliates participating in the Program, (ii) following PNC's written instructions relating to the form and content of any marketing materials, (iii) the use by IFS of the PNC Marks in accordance with the Program, or (iv) a material breach of this Agreement by PNC. However, PNC shall not have any obligation to indemnify IFS or their respective directors, officers and employees to the extent that any losses, expenses or costs result from, arise out of, or relate to (i) the negligence, gross negligence, or willful misconduct of IFS or their respective directors, officers and employees or (ii) a material breach of this Agreement by IFS (including a failure to obtain or follow PNC written instructions relating to the form and content of Marketing Materials). If indemnification is sought by any director, officer or employee of IFS, IFS shall act on behalf of such director, officer or employee, and PNC shall be entitled to rely on IFS's acts and representations as representing the acts and representations of such director, officer or employee.

(b) IFS's Indemnification. Subject to the limitations set forth herein, IFS shall indemnify and hold harmless PNC and its Affiliates participating in the Program, and their respective directors, officers and employees for all losses, expenses and costs, including but not limited to, reasonable attorneys fees, judgments, penalties and other payments in settlement or other disposition, in connection with any claims, suits or proceedings made or brought by a Third Party relating to the Program to the extent that such losses, expenses and costs result from, arise out of, or relate to (i) the gross negligence or willful misconduct of IFS, (ii) a material breach of this Agreement by IFS, (iii) the use by PNC of the IFS Marks in accordance with the Program, or (iv) the negligent act or willful misconduct of an Agency, the breach by an Agency of its obligations under its Agency Agreement with IFS as specified in Section 2.4 above, and/or the failure of an Agency to be properly licensed under (or otherwise properly comply with) Applicable Law. However, IFS shall not have any obligation to indemnify PNC or any PNC Affiliate participating in the Program, or their respective directors, officers and employees to the extent that any losses, expenses or costs result from, arise out of, or relate to (i) the negligence, gross negligence or willful misconduct of PNC or any PNC Affiliate participating in the Program, or their respective directors, officers and employees, (ii) following written instructions or approvals of PNC relating to the form and content of any marketing materials, or (iii) a material breach of this Agreement by PNC. If indemnification is sought by any director, officer or employee of PNC or its Affiliates, PNC shall act on behalf of such director, officer or employee, and IFS shall be

entitled to rely on PNC's acts and representations as representing the acts and representations of such directors, officer or employee.

Section 9.2. Indemnification Procedures.

(a) Notice. No Party shall be entitled to indemnification under this Section 9 unless the Party seeking the indemnification (the "Indemnified Party") gives written notice of a claim for indemnification to the other Party (the "Indemnifying Party") within the earlier of (i) six (6) months after the Indemnified Party becomes aware of any claim, suit or proceeding for which indemnification may be available under this Section 9, or (ii) six (6) years after the Termination Date of this Agreement.

(b) General Procedure. Provided that prompt notice is given (unless the failure to provide such notice would not prejudice the interests of the Indemnifying Party), the Indemnifying Party, at its own expense and using counsel of its own choosing, will promptly defend, contest and otherwise protect against any such claim, suit or proceeding. If the Indemnifying Party fails to timely defend, contest or otherwise protect against any such claim, suit or proceeding, the Indemnified Party may, but will not be obligated to, defend, contest or otherwise protect against the same, and make any compromise or settlement thereof and recover the entire cost of the defense, compromise or settlement from the Indemnifying Party, including reasonable fees and disbursements of counsel and amounts paid as a result of the resolution, settlement or compromise of such claim, suit or proceeding.

(c) Role of Indemnified Party. The Indemnified Party may, but will not be obligated to, participate in the defense of any Third Party claim, suit or proceeding, at its own expense and using counsel of its own choosing, but the Indemnifying Party shall be entitled to control the defense thereof unless the Indemnified Party has relieved the Indemnifying Party from liability with respect to the particular matter. The Indemnified Party shall cooperate and provide such assistance as the Indemnifying Party reasonably may request in connection with the Indemnifying Party's defense and shall be entitled to recover from the Indemnifying Party the reasonable costs of providing such assistance (including reasonable fees of any counsel retained by the Indemnified Party with the consent of the Indemnifying Party to facilitate such assistance). The Indemnifying Party shall inform the Indemnified Party on a regular basis of the status of any claim, suit or proceeding and the Indemnifying Party's defense thereof. Any payments required to be made under this Section 9 shall be made promptly by the Party responsible therefor.

(d) Limitations on Parties. In any Third Party claim, suit or proceeding, the defense of which is controlled by the Indemnifying Party: (i) the Indemnifying Party shall not, without the Indemnified Party's prior written consent, compromise or settle such claim, suit or proceeding, if (1) such compromise or settlement would impose an injunction or other equitable relief upon the Indemnified Party or (2) such compromise or settlement does not include the Third Party's release of the Indemnified Party from all liability relating to such claim, suit or proceeding; and (ii) the Indemnified Party shall not compromise or settle such claim, suit or proceeding without the prior written consent of the Indemnifying Party, provided that, if the Indemnified Party desires to

compromise or settle such claim, suit or proceeding and the Indemnifying Party refuses to consent to such compromise or settlement, the Indemnified Party may enter into a compromise or settlement but shall be solely responsible for the cost of any compromise or settlement amount.

Section 9.3. Escrow Fund for IFS' Indemnification Obligations.

(a) Commencing on the first anniversary date of the Effective Date, IFS shall deposit $10,000.00 into an interest bearing deposit account ("Escrow Account") established by PNC and IFS at PNC. On the first Businness Day of each month thereafter, IFS shall deposit $10,000.00 into the Escrow Account; provided, however, that under no circumstances shall IFS be required to deposit any monies into the Escrow Account which would cause the total amount paid into the Escrow Account to exceed $1,000,000.00. Such funds shall be separated from, and not intermingled with, the funds of PNC. All funds and earning thereon in the Escrow Account shall be the property of IFS, but IFS shall have no right to access the Escrow Account, which may only be accessed by PNC in accordance with this Section 9.3. Unless the Parties otherwise agree in writing, the Escrow Account shall be maintained for a period of two years after the termination of this Agreement.

(b) During the Term and for a period of two years after the termination of this Agreement, PNC shall be entitled to withdraw amounts from the Escrow Account from time to time and at any time for all losses, expenses and costs incurred by PNC, including but not limited to, reasonable attorneys fees, judgments, penalties and other payments in settlement or other disposition, in connection with any claims, suits or proceedings made or brought by a Third Party relating to the Program and for which IFS has indemnified PNC pursuant to Section 9.1(b)(iv) above. PNC shall notify IFS in writing in advance of any withdrawal made by PNC from the Escrow Account and shall provide IFS with documentation evidencing the basis on which it is entitled to make such withdrawal. In the event amounts then-held in the Escrow Account are insufficient to cover such losses, expenses and costs of PNC ("Escrow Deficiency"), PNC shall have the right to deduct an amount equal to the Escrow Deficiency from future $10,000.00 deposits into the Escrow Account until such time as the Escrow Deficiency is paid in full to PNC. On the date which is two years after the termination of this Agreement, all amounts then-held in the Escrow Account shall be paid by PNC to IFS in immediately available funds.

Section 9.4. No Alteration.

Nothing in this Section 9 shall be deemed to alter the liability of either PNC or IFS to the other for losses, expenses and costs incurred by either such party in connection with a breach of this Agreement; provided, however, that PNC shall look solely to the Escrow Account for any losses, expenses or costs incurred by PNC as to which IFS has indemnified PNC under Section 9.1(b)(iv) above.

## Section 10.

## Term and Termination

Section 10.1 Term of Agreement

(a) The Initial Term of this Agreement shall be for a period of ten (10) years commencing on the Effective Date and ending on February 26, 2008.

(b) In the event that this Agreement is not sooner terminated as provided herein, upon the expiration of the Initial Term, this Agreement will renew automatically for an Additional Term of five (5) years, unless PNC or IFS gives written notice pursuant to Section 10.2(b). The Additional Term will be extended automatically for an additional five (5) year period unless a similar written notice is given.

Section 10.2 Termination

This Agreement may be terminated under the following circumstances within the time specified:

(a) By mutual agreement of the Parties hereto within a mutually agreed upon time period;

(b) By PNC as of the end of the Initial Term or any Additional Term by the giving of a written notice of termination to IFS, which notice shall be given at least twelve (12) months prior to the end of the Initial Term or the end of the Additional Term to which the notice shall relate;

(c) By IFS as of the end of the Initial Term or any Additional Term by the giving of a written notice of termination to PNC, which notice shall be given at least twelve (12) months prior to the end of the Initial Term or the end of the Additional Term to which the notice shall relate;

(d) By IFS in writing if PNC has in any material respect breached any covenant or obligation contained herein or any representation or warranty contained herein, and such breach has not been cured within sixty (60) days after the date on which written notice of such breach is given to the Party committing such breach;

(e) By PNC in writing if IFS has in any material respect breached any covenant or obligation contained herein or any representation or warranty contained herein, and such breach has not been cured within sixty (60) days after the date on which written notice of such breach is given to the Party committing such breach;

(f) In the event PNC or IFS files for or is subject to any insolvency or bankruptcy proceeding, makes an assignment for the benefit of creditors or is subject to receivership,

conservatorship or liquidation, in which case this Agreement may be immediately terminated by the solvent party giving a written notice of termination to the insolvent party. In such event, this Agreement shall not constitute assets or property in any insolvency proceeding, and therefore may not be assigned to any trustee, receiver, creditor or other Third Party;

(g) In the event PNC has not established on PNC's books at least 400 loans or lines of credit on any one Business Day within the first thirty-six (36) months after the Effective Date of this Agreement, by PNC giving a written notice of termination to IFS within ninety (90) days after the end of such 36 month period; or

(h) In the event PNC's ROA does not exceed .95% on December 31, 2001, by PNC giving a written notice of termination to IFS within ninety (90) days after such date.

Section 10.3 Survival of Obligations; Relationship with AMS

(a) The termination of this Agreement shall not relieve any Party from any obligation to the other Party or from any liability arising under the Agreement to the other Party prior to termination. If this Agreement is terminated pursuant to Sections 10.2(b), 10.2(c), or 10.2(d), PNC shall continue to pay the monthly amounts specified in Section 6.1(i) to IFSI for a period of three (3) years from the date of termination. If this Agreement is terminated by PNC pursuant to Sections 10.2(e), 10.2(f), 10.2(g), or 10.2(h), no such monthly amounts shall be in any way payable by PNC to IFSI. In addition, in the event any applications for Services have been submitted to PNC on or prior to the termination date of this Agreement, PNC shall continue to process such applications, originate acceptable loans, and pay compensation to IFSI pursuant to Section 6.1(ii).

(b) In the event (i) this Agreement is terminated pursuant to Sections 10.2(b) or 10.2(d) and (ii) IFS' contractual arrangement with AMS is in full force and effect on the date of the termination of this Agreement, PNC will not, for a period of two (2) years after the date of the termination of this Agreement, enter into any arrangement directly with AMS to use the AMS System to offer the Services.

## Section 11.

## General Provisions

Section 11.1 Entire Agreement

This Agreement, including exhibits and schedules hereto, sets forth the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior agreements, written or oral, with respect to such subject matter. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and permitted assigns.

Section 11.2 Third Party Beneficiary

Except as provided in Section 11.5 and as to any Indemnified Party, no person other than the Parties hereto shall have any rights under this Agreement.

Section 11.3 Amendment

This Agreement may be amended or supplemented at any time by mutual agreement of the Parties hereto. Any amendment or supplement to this Agreement must be in writing and executed by the Parties' duly authorized officers.

Section 11.4 Notices

Any notices required or permitted to be given to any Party in connection with this Agreement shall be in writing, shall be deemed delivered when received and sufficient if delivered personally or sent by Federal Express or similar overnight courier services, transmitted by telecopier or similar means, or mailed by either first class mail, Express Mail, or registered or certified mail, postage prepaid, addressed as follows:

If to PNC:

PNC BANK, F.S.B.
210 Sixth Avenue
Pittsburgh, PA 15265
Attn: President
Fax: (412) 768-2701

If to IFSI:

INDEPENDENT FINANCIAL SERVICES, INC.
19 Grove Avenue
Westerly, RI 02891
Attn: President
Fax: (401) 596-3360

If to IFSMS:

IFS MORTGAGE SERVICES LLC, INC.
19 Grove Avenue
Westerly, RI 02891
Attn: President
Fax: (401) 596-3360

A Party may change its address set forth by giving the other Party notice of such change in accordance with the provisions of this Section 11.4.

Section 11.5 Assignment

No Party may assign its rights or obligations under this Agreement without the written consent of the other Party. The merger, consolidation, or change of control of one Party will not constitute an assignment of this Agreement.

Section 11.6 Press Releases

PNC and IFS shall agree with each other as to the form and substance of any press release relating to this Agreement and the program contemplated hereunder, and consult with each other as to the form and substance of other public disclosures related thereto; provided, however, that nothing contained in this Agreement shall prohibit any Party from making any disclosure which its legal counsel reasonably deems necessary to comply with Applicable Law.

Section 11.7 Severability Clause

It is the intent of the Parties that this Agreement be construed and interpreted in a manner such as to permit enforcement of all of its terms. However, if any provision of this Agreement is held invalid or unenforceable in any jurisdiction for any reason, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without invalidating the remaining provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.8 Further Assurances

The Parties hereto agree to do such further acts and to execute and deliver such additional assignments, agreements, instruments and other documents as may be required to carry into effect the purposes contemplated by this Agreement.

Section 11.9 No Implied Waivers; Remedies

No failure or delay on the part of any Party in exercising any right, privilege, power, or remedy under this Agreement, and no course of dealings among the Parties, shall operate as a waiver of such right, privilege, power, or remedy; nor shall any single or partial exercise of any other right, privilege, power or remedy under this Agreement preclude any other or further exercise of any right, privilege, power, or remedy or the existence of any other right, privilege, power, or remedy. No waiver shall be asserted against any Party unless signed in writing by such Party.

Section 11.10 Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania applicable to agreements made and entirely performed within such jurisdiction, without regard to the conflict of laws principles thereof, except to the extent federal law may be applicable.

Section 11.11 Headings

The headings contained in this Agreement are for convenience only and shall not affect the construction of any provision of this Agreement.

Section 11.12 Relationship of Parties

Nothing contained in this Agreement shall constitute or be construed by the Parties or any Third Party as creating a partnership, joint venture or principal and agent relationship between the Parties. It is agreed that each Party shall at all times be an independent contractor and not an agent for the other Party.

Section 11.13 Counterparts

This Agreement may be executed in any number of counterparts, and each such counterparts shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement.

Section 11.14 Joint and Several Liability

IFSI and IFSMS shall be jointly and severally liable to PNC for all duties, responsibilities and obligations of IFS pursuant to the terms of this Agreement.

Section 11.15 Dispute Escalation

In the event of any disputes between the Parties regarding the rights and obligations of the either Party under the terms of this Agreement, the Parties agree that the dispute will be submitted to upper management of the Parties to enable the Parties to discuss the dispute in good faith and to seek to resolve the dispute amicably.

Section 11.16 Force Majeure

In the event either Party fails to perform its obligations in whole or in part under this Agreement as a consequence of any of the following which are beyond the reasonable control of such Party: labor disputes, strikes, acts of God, floods, lightning, severe weather, shortages of materials, rationing, utility or communications failures caused by a third party, failure of VISA or MasterCard, failure or dely in receiving electronic data, earthquakes, war, revolution, civil

commotion, blockage, embargo, or any law, order, proclamation, regulation, ordinance, demand or requirement having legal effect of any government or any judicial authority or representative of any such government, then such failure to perform shall not be considered a breach of this Agreement during such period of disability. The disabled party shall use its best efforts to meet its obligations under this Agreement, and shall promptly and in writing notify the other Party of the occurrence and advise the other Party of the extent of the disabled party's disability and the expected duration of the disabled Party's inability to perform its obligations hereunder.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective officers or authorized agents, and attested by their officers duly authorized, as of the day and year first written above.

ATTEST:

By: [signature]

Title: Secretary

PNC BANK, F.S.B.

By: [signature]

Title: Senior Vice President

ATTEST:

By: [signature]

Title: Vice President

INDEPENDENT FINANCIAL SERVICES, INC.

By: [signature]

Title: President

ATTEST:

By: [signature]

Title: Vice President

IFS MORTGAGE SERVICES LLC, ~~INC.~~

By: [signature]

Title: PRESIDENT