UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INDEPENDENT FINANCIAL SERVICES, INC., | : | |
| Plaintiff | : | |
| v. | : | C.A. No. 05-275-ML |
| PNC BANK, N.A., f/k/a PNC BANK, FSB, | : | |
| Defendant | : | |

**PRETRIAL MEMORANDUM OF DEFENDANT PNC BANK**

Defendant PNC Bank, N.A., f/k/a PNC Bank, F.S.B. ("PNC"), submits this Pretrial Memorandum pursuant to this Court's Pretrial Order, as amended. Because the parties must still complete two additional depositions, including that of Plaintiff's proffered expert witness, see infra, PNC reserves the right to supplement this memorandum as necessary.

## I. PNC's STATEMENT OF THE CASE

PNC anticipates presenting the facts set forth below in proof of its case at trial. In large part, these facts will be established through PNC's witnesses. Those witnesses, and a summary of their anticipated testimony, are set forth in PNC's separate Witness List. PNC reserves the right to supplement these facts based upon the case presented at trial by Plaintiff Independent Financial Services, Inc. ("IFS").

### A. Facts

### 1. Parties and Background

PNC is a national banking association with a principal place of business in Pittsburgh, Pennsylvania. In the 1990s, PNC was involved in an effort to expand its consumer lending

activities and products beyond the geographical "footprint" of its own branches and offices. This included, among other things, the development of so-called "affinity" relationships, in which PNC would partner with other institutional sources of potential borrowers. One such program, for example, was with the American Automobile Association ("AAA"), which would refer auto loans and other consumer credit opportunities to PNC on a nationwide basis.

In this context, PNC became aware in 1997 of IFS, from Westerly, Rhode Island. IFS, which was first formed in 1995, was in the business, among other things, of identifying sources of credit for a purported "network" of independent insurance agents to provide to their clients. Prior to its introduction to PNC in 1997, IFS briefly had an arrangement with NationsBank whereby IFS referred certain lending opportunities from clients of the independent insurance agents to NationsBank in return for transaction-based fees.

In June 1997, IFS and PNC were introduced to each other. The IFS relationship with NationsBank and its successor had been terminated, and IFS was seeking another national lending source. Richard Herriott ("Herriott"), the President and a minority shareholder of IFS, met in June 1997 in Westerly with Don Poppleton ("Poppleton") of PNC. The parties held initial discussions about a potential business relationship.

**2. <u>The "Independent Advantage" Program</u>**

As of its first meeting with PNC, IFS claimed to have an exclusive contractual right to provide sources of credit to approximately 35,000 independent insurance agencies associated with an entity known as AMS Services, Inc. ("AMS"), which was in turn affiliated with several major insurance companies. IFS had entitled this program the "Independent Advantage Program," and had registered that name as a trademark. IFS claimed to have the exclusive right

to provide consumer loan products to the purported network of agencies by virtue of an existing contract with AMS.[1]

At times between 1995 and 1996, IFS and Herriott had referred certain loan products, primarily personal lines of credit and auto loans, to the network of agencies through NationsBank. That early iteration of the Independent Advantage Program did not include any mortgage products or secured home equity loans because IFS lacked the necessary licensing and other regulatory approval to provide such products in many states. During the NationsBank relationship, IFS sent a mass mailing (or multiple mass mailings) to agencies referred to it by AMS, seeking their commitment to an exclusive loan-referral program with IFS. As of 1997, IFS claims that nearly four hundred (400) such agencies had responded in writing, committing themselves on an open-ended basis to work with IFS in placing such loans.

NationsBank sold its consumer loan portfolio to MBNA Bank ("MBNA") in or around 1996. IFS made efforts to continue the Independent Advantage Program with MBNA, but without success. MBNA terminated the relationship, and IFS did not contest MBNA's right to do so. Instead, IFS decided to seek another source of credit availability, leading to the meetings in 1997 with PNC.

**3. The PNC-IFS Negotiations and the Financial Services Agreement**

Between the late summer of 1997 and February 1998, PNC and IFS engaged in a series of meetings and communications in which they negotiated the business terms of a contractual relationship in which PNC would be the exclusive, nationwide provider of consumer loan products to the IFS network of independent insurance agents. Those negotiations ultimately

[1] To date in this litigation, IFS has not been able to locate or produce a document evidencing any pre-PNC contract between AMS and IFS. Accordingly, PNC does not concede that any such contract necessarily existed, although due diligence conducted at the time, as well as discovery in this case, confirms that there was an IFS-AMS relationship.

resulted in the Financial Services Agreement dated February 22, 1998 (the "Agreement") between and among PNC, IFS and an IFS affiliate known as IFS Mortgage Services, LLC ("IFS Mortgage").

IFS claimed throughout its initial discussions with PNC that the relationship with AMS gave it access to as many as 35,000 independent insurance agencies. Documents produced by IFS in this litigation indicate that as late as 2001, more than eight (8) years after its first introduction to AMS, IFS had actually amassed a list of only about 11,000 agencies for which it had confirmed contact information. Nonetheless, as of IFS' introduction to PNC in mid-1997, it appears undisputed that IFS had confirmed contact information for at least several thousand independent agencies, and claimed a right of access to as many as 35,000 or more. Approximately four hundred (400) had committed in writing to do business with IFS.

In early September 1997, Herriott of IFS wrote a lengthy letter to PNC in which he summarized the status of the parties' business negotiations. Among other things, he noted PNC's desire for certain volume-based thresholds that would require IFS to generate a sufficient volume of loans to justify PNC's economic commitment to and involvement in the program. In that letter, Herriott insisted upon a "careful and conservative" approach to any volume thresholds and, in that spirit, suggested that IFS could commit to achieving as many as 1,000 applications per day within the first 6-8 months of the program.[2]

During the late summer of 1997, the parties were also discussing the system by which loan applications and loan documents would be processed and transmitted between and among PNC, IFS, the insurance agents and their clients. Because of the sheer number of agents allegedly affiliated with IFS, and because of the volume projections involved, any such system

[2] Herriott copied his counsel at Nixon Peabody on this letter. That law firm assisted IFS in the negotiation and drafting of the Agreement.

had to be highly automated and had to permit web-based data and document transmissions between PNC and agents closing loans in the field. In addition, because the parties contemplated a nationwide arrangement, it would be necessary to generate and transmit loan documents that comported with legal and other regulatory requirements in as many as fifty (50) states. In September of 1997, representatives of PNC and IFS met to discuss the technical architecture of a system whereby IFS would forward loan applications electronically into PNC's web-based application processing program, and whereby PNC would then be able, if and when loans were approved, to transmit legally compliant loan documentation to agents for remote printing in their offices, so that loans could be promptly closed. PNC representatives told IFS personnel that this would require agents to obtain and maintain printers that could interface with PNC's licensed LaserPro software, which provided loan documents in compliance with the laws of all 50 states, and which could print documents (including checks) in the necessary formats.

In February 1998, following the exchange of numerous drafts between the parties and counsel, the parties signed the Agreement. Among other things, the Agreement provided that any agencies participating in the program had to sign one of two form Agency Agreements that were incorporated by reference. Those Agency Agreements required participating agencies to "purchase and obtain any equipment and supplies necessary to transmit information to [IFS] and to print loan documentation, loan disclosures and proceeds checks." The Agreement also required IFS, among other things, to "ensure that all Agencies participating in the Program have obtained and maintain all licenses, permits, and other governmental authorizations to offer the Services and receive compensation therefor." PNC agreed to provide certain summary materials regarding relevant law in all 50 states, but IFS otherwise agreed to assume responsibility for "all

licenses, permits, and other governmental authorizations required by a jurisdiction prior to doing business in such jurisdiction."[3]

The Agreement provided that PNC was only required to make loans on the highest tier of credit risks, known in the business as "A" grade loans. PNC was not required to extend credit on so-called "B," "C," or "D" grade loans, but did agree to "make good faith efforts to locate and establish an arrangement with a . . . funding source" for such sub-prime loans. The Agreement gave PNC "sole discretion" to set pricing terms (including interest rates) on loan products, so long as those pricing terms were generally consistent with pricing terms set by certain objective, third-party rating systems identified in the Agreement.

The Agreement was to remain in effect for an initial term of ten (10) years, but both parties had the right to terminate early in certain identified circumstances. Section 10.2(g), for instance, provided that PNC could terminate the Agreement:

> In the event PNC has not established on PNC's books at least 400 loans or lines of credit on any one Business Day within the first thirty-six (36) months after the Effective Date of this Agreement, by PNC giving a written notice of termination to IFS within ninety (90) days after the end of such 36 month period.

Based upon the parties' precontractual exchange of correspondence and drafts, and other indicia, it is clear that this language gave PNC the right to terminate the contract if, after three (3) full years, IFS could not generate 400 booked loans on any <u>one</u> <u>day</u>. Even IFS acknowledged during negotiations that giving IFS as long as eight (8) months to generate 1,000 loan applications <u>per day</u> was a "careful and conservative" approach, particularly in light of its frequent representation

[3] Following the termination of the NationsBank/MBNA relationship, IFS had formed IFS Mortgage for purposes of providing any licensing or regulatory approval required to place and sell certain products, particularly home equity loans and lines of credit. As used in the Agreement, the term "IFS" means both IFS and IFS Mortgage.

that it had access to as many as 35,000 agencies.[4] Based on an assumed approval rate of approximately forty percent (40%), this requirement of 1,000 applications per day evolved into a requirement of four hundred (400) loans booked by PNC on at least one day in the first three (3) years.

**4. The Parties' Performance Under the Agreement**

Promptly after execution of the Agreement, PNC and IFS, working together, commenced efforts to launch the program. This included the identification and establishment of a small group of "pilot" agencies. It also included efforts to recruit more agencies associated with IFS' Independent Advantage Program. Representatives of PNC frequently traveled to training and "sign-up" sessions with agents when such sessions were organized by IFS. However, despite those efforts, the progress of recruiting agents to participate in the program was always slow, and fell substantially behind projections generated by IFS.

The parties also undertook efforts to ensure that participating agencies were appropriately licensed in the jurisdictions in which they would sell certain regulated products, and to ensure that participating agencies were equipped to remotely print loan documentation and checks, so that loans could be promptly processed and closed. With regard to licensing, PNC provided a summary of the relevant law, as required by Agreement, but IFS was often ultimately unable to secure the necessary licensing. Progress on this item was always slow, despite PNC's assistance, and had an adverse impact on loan volumes and on the ultimate success and profitability of the program. In addition, IFS moved forward with vendors referred to it by PNC for the acquisition

[4] In this same time frame, Poppleton of PNC conducted due diligence into the nature and existence of the network of agents, and IFS' access to it through its relationship with AMS. Poppleton concluded that IFS had access to the agency base, but had no ability to force the agents to place loans with PNC or any other lender. Accordingly, it became clear to him that it was necessary to place the contractual burden of delivering the agents upon IFS, which was, in essence, "selling" its access to that network to PNC. Hence, Poppleton and PNC consistently insisted on the volume threshold set forth above, as an ultimate test of the legitimacy of the program and of IFS' ability to deliver the agents. IFS agreed to the contractual threshold, but now seeks to avoid being bound by it.

of hardware and software components that would permit agents to print loan documents and checks in their offices.[5] Despite the fact that IFS agreed to these terms and conditions as part of the Agreement, IFS complained at times that these requirements, and the costs thereof, were unreasonable and that agents resisted.

Pursuant to language in the Agreement, PNC promptly and diligently processed any and all applications for loans. It was only required to extend credit on "A" grade applications, and had sole and exclusive discretion on pricing terms, as long as those pricing terms were consistent with relevant objective industry standards. Over and above its web-based, automated loan processing system, individual PNC employees dedicated to the IFS program frequently undertook an individual review of any loan declinations in an effort to ensure that as many loans as possible were approved.

At the outset of the relationship, PNC also agreed to loan IFS $250,000, to give IFS capital to invest in the program. A loan agreement was executed contemporaneous with the Agreement, and incorporated by reference therein. At several subsequent stages, as IFS attempted to build the agency network and the success of the Independent Advantage Program, IFS asked PNC to loan further funds. The total amount loaned to IFS by PNC ultimately reached a high point of approximately $625,000 by 2000. However, by late 2000, IFS continued to have financial problems and continued to seek other sources of funding. In connection with those efforts in late 2000, IFS asked PNC to release it from any promise of exclusivity in the

[5] Assuming that an individual agent did not have any of the necessary hardware or software, the total cost of the required materials would be approximately $2,600. In cases in which agents were unwilling or unable to absorb that initial expense, PNC was prepared to lend funds to those agents.

Agreement, so that IFS could make efforts to expand its Independent Advantage Program to other banks. PNC gave such consent in November of 2000.[6]

Despite allegations to the contrary by IFS, PNC respectfully submits that it performed consistent with all of its contractual obligations and any relevant representations made in the Agreement. PNC loaned substantial funds to IFS, and made efforts beyond what was required in the Agreement in an attempt to make the program successful. Nonetheless, the program was never economically viable and failed to meet the required contractual thresholds, largely due to IFS' failure to generate sufficient levels of agency participation and associated loan volume. The number of participating agencies, and the associated volume of booked loans never came close to the contractual requirements, or to any projections or representations made by IFS. For instance, as late as February 2000, two (2) years into the program, IFS had only signed up 397 agencies, which was no more than had committed to the NationsBank program more than three (3) years earlier. This was despite IFS' own projection, in a Business Plan submitted to PNC that it would have 1,500 agencies signed up by the end of 1999. Moreover, IFS never even came close to the threshold of 400 booked loans on a single day. PNC will produce further evidence at trial, through witnesses and documents, of this aspect of the history of the parties' relationship.

**5. <u>Termination of the Agreement</u>**

Consistent with the foregoing, PNC advised IFS on or about March 2, 2000 that it was terminating the Agreement pursuant to section 10.2(g), referenced above. In correspondence in response, IFS did not contest or disagree with PNC's basis for termination, but simply asked for

[6] Following PNC's termination of the Agreement in March 2001, IFS continued to owe PNC in excess of $600,000. IFS acknowledged in a forbearance agreement executed on March 15, 2002, that the outstanding balance, as of that time, including unpaid interest, was $629,743.60. In June of 2002, PNC ultimately sold that loan to a third party, National Loan Investors, L.P. ("NLI"). IFS subsequently entered into an agreement with NLI regarding any proceeds recovered from this lawsuit.

an extension of the effective date of that termination. PNC declined, and the termination was effective April 30, 2007.

Based upon information gleaned during discovery, PNC has learned that even prior to termination, and even prior to PNC's agreement to release IFS from any contractual exclusivity obligations in late 2000, IFS was in contact with several other banks regarding comparable arrangements and undertakings, making similar representations about the breadth and depth of an alleged "network" of thousands of independent insurance agents. Those efforts continued for at least several years after termination of the IFS/PNC relationship. None of those relationships were ultimately successful, nor did any result in any greater levels of agency participation. PNC intends to present evidence of these events at trial, both with regard to certain liability argument to be made by IFS, and with regard to IFS' claims concerning its alleged damages.

**6. <u>IFS' Damages Claims</u>**

IFS claims to have suffered approximately $8.5 million in damages, and bases its claim exclusively on a theory of lost profits. PNC respectfully submits that IFS' damages claim is without merit as a matter of law (see below), and also suffers from numerous factual flaws and deficiencies. PNC reserves the right to present evidence and arguments on these issues at trial, as necessary.

**B. <u>Witnesses</u>**

In accordance with this Court's Pretrial Order, as amended, PNC has separately filed its Witness List with this Court, and has served copies of the same upon opposing counsel. That Witness List is incorporated by reference herein.

## II. <u>LEGAL ARGUMENT</u>

### A. <u>Pretrial Legal Issues</u>

In addition to any substantive legal arguments to be made at trial, PNC anticipates argument on certain pretrial legal issues. Those issues will be addressed in any appropriate motions in limine to be submitted consistent with this Court's pretrial schedule. Among other things, PNC anticipates raising issues concerning the admissibility of certain opinions to be offered by IFS through its proffered expert witness, Mark Filler, CPA.[7]

**B. Trial Issues**

The Complaint in this matter contains four (4) counts, one of which (Count III for breach of fiduciary duty) has been dismissed. There are three (3) counts remaining, all of which may be tried to the jury. Count I alleges breach of contract. Count II alleges breach of the covenant of good faith and fair dealing, and Count IV alleges misappropriation and breach of contractual confidentiality obligations.[8] Under the terms of the Agreement, any and all such claims arising thereunder are to be governed by the law of the Commonwealth of Pennsylvania.

**1. Breach of Contract (Count I)**

In Count I, IFS alleges that PNC breached its contract with IFS when PNC terminated the Agreement, and further alleges that PNC failed to deliver certain loan products and services as promised. This is the primary and predominant claim at issue in the trial of this case, and the ultimate test of the legitimacy of PNC's termination in 2001.

[7] IFS first identified Filler on or about March 12, 2007, after the close of discovery, and first produced certain documents relied upon by Filler on March 30, 2007. PNC has still not had an opportunity to depose Filler. IFS has agreed to make him available for deposition on late April 24, 2007. PNC currently intends to contest the admissibility of Filler's proferred opinions on numerous grounds, including (1) timeliness, (2) failure to satisfy the required Daubert standards and to rely upon adequate or reliable data, and (3) inconsistency with Pennsylvania law or any other applicable law governing lost profits or other relevant damage theories. PNC will submit that motion consistent with the Court's pretrial schedule. As of this writing, PNC has filed an emergency motion with this Court, seeking relief from the Court's pretrial schedule on this sole issue, in light of the late disclosure of this expert by IFS and in light of the current date set aside for Filler's deposition.

[8] At the summary judgment stage, this Court did not rule on PNC's argument that the claim for misappropriation and breach of confidentiality is barred by the applicable statute of limitations. That issue, therefore, remains to be determined at trial.

Under Pennsylvania law, in order to prove a breach of contract claim against PNC, IFS must prove "(1) the existence of a contract, including its essential terms, (2) breach of a duty imposed by the contract and (3) resultant damages." Corestates Bank v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999); Monarch, Inc. v. The St. Paul Prop. and Liability Ins. Co., No. 03-CV-0054, 2004 WL 1717618, at * 2 (E.D. Pa. July 30, 2004). Here, IFS alleges that PNC failed to fulfill certain promises in the Agreement, and that PNC's termination constituted a breach because, under IFS' interpretation of the Agreement, there was no shortfall in the number of loans required under Section 10.2(g). Additionally, IFS alleges that that even if PNC has correctly interpreted the terms of Section 10.2(g), PNC was not entitled to terminate due to its own failure to perform its obligations under the Agreement.

PNC maintains that under the clear and unambiguous terms of the Agreement, it was entitled to terminate if IFS failed to establish at least 400 booked loans or lines of credit on any one business day within the first thirty-six (36) months of the relationship. As of March 2, 2001, the date upon which PNC notified IFS in writing that it was terminating the Agreement, there was not one day on which four hundred (400) or more loans or lines of credit had been booked. Despite contemporaneous evidence to the contrary, IFS now asserts that PNC could only terminate the Agreement if IFS failed, within the first three years, to establish a cumulative total of 400 booked loans. However, this is entirely at odds with all other evidence of the parties' goals and objections, including IFS' own projections. A cumulative requirement of 400 booked loans in three years would have been meaningless to both PNC and IFS.

PNC submits that the terms of the Agreement are unambiguous and speak for themselves, and that, as such, it is a matter for this Court to decide what the relevant language means. See Greater Nanticoke Area School District v. Greater Nanticoke Area Education Assoc., 760 A.2d

1214, 1217 (Pa. Commw. Ct. 2000) ("[w]here a contract case is tried to a judge and jury, the trial judge determines as a threshold issue whether the contract language is ambiguous or unambiguous as a matter of law. If the court finds the language to be clear and unambiguous, it does not submit the issue to the jury"). Under Pennsylvania law, "[w]hen the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the documents." Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co., 905 A.2d 462, 481 (Pa. 2006); see also Sternadori v. SCS Healthcare Marketing, Inc., No. 05-367, 2007 WL 710298, at * 3 (E.D. Pa. Mar. 6, 2007) ("[w]hen the terms of a contract are clear and unambiguous, the court must consider only the express language of the contract in determining intent," and "[w]here the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention"); Black v. Jamison, 913 A.2d 313, 318 (Pa. Ct. Cmn. Pl. 2006) ("[t]he fundamental rule in interpreting a contract is to ascertain and give effect to the intent of the contracting parties . . . . The intent of the parties to a written agreement is embodied in the writing itself"). Thus, as here, "[w]here . . . the language of the contract is clear and unambiguous, a court is required to give effect to that language." Patriot Commercial Leasing Co. v. Kremer Restaurant Enterprises, LLC, 915 A.2d 647, 651 (Pa. Super. Ct. 2006); Pennsylvania Nat. Mutual Casualty Co. v. Black, 916 A.2d 569, 578 (Pa. 2007).

Alternatively, should this Court determine that Section 10.2(g) is ambiguous or is susceptible of different interpretations, it will be a question of fact for the jury to decide upon the parties' original intent. See Greater Nanticoke, 760 A.2d at 1217; Allstate, 905 A.2d at 469. "The terms of a contract are ambiguous if the terms are reasonably or fairly susceptible of different constructions and are capable of being understood in more than one sense . . . [or] if the language is obscure in meaning' through indefiniteness of expression or has a double meaning."

Jamison, 913 A.2d at 318. If this Court determines that the termination provision is ambiguous, PNC is entitled to present, and the jury should consider, parol evidence relating to the intent of the parties in entering into the Agreement. Reliance Ins. Co. v. IRPC, Inc., 904 A.2d 912, 916 (Pa. Super. Ct. 2006) ("[i]f the contract is ambiguous, then the fact finder may look to parol evidence to determine the contract's meaning"); Ragnar Benson, Inc. v. Hempfield Township Municipal Auth., 2007 WL 240276, at * 5 (Pa. Super. Ct. Jan. 30, 2007). Parol evidence may be introduced "to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances." Allstate, 905 A.2d at 468. Should the meaning of the pertinent language be presented to the jury, PNC will provide ample evidence as to the intent of the parties, and PNC believes that, upon consideration of the evidence, the jury will determine that PNC was entitled to terminate the Agreement because 400 or more loans or lines of credit were not booked through the Independent Advantage Program on any one day.

IFS' claim for breach of contract is not limited to the issue of whether PNC was entitled to terminate based on a shortfall in the number of booked loans. Rather, IFS asserts that even if it did fail to achieve a required contractual threshold, any such failure was attributable to PNC's own failure to fulfill certain obligations under the Agreement. (See Compl. at ¶ 17.) Specifically, IFS alleges that any shortfall was due to PNC's alleged "failure to offer loans to agency borrowers who satisfied PNC loan criteria." (Id.). Furthermore, IFS alleges that PNC rejected qualified loan applicants, made unreasonable demands on agencies, made extraordinary demands of IFS, improperly used confidential information, failed to offer subprime loans to member agencies, and failed to provide adequate technical support, products, and resources .

(Id. at ¶ 11-16.) At trial, PNC will present evidence on both the termination claim and to rebut and contest IFS' allegations that PNC failed to fulfill its obligations under the Agreement.

**2. Breach of the Covenant of Good Faith and Fair Dealing (Count II)**

In Count II, IFS asserts a claim of breach of the covenant of good faith and fair dealing. Pennsylvania has adopted the covenant of good faith and fair dealing in the performance of a contract, as found in Section 205 of the Restatement (Second) of Contracts. Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992). However, Pennsylvania law provides that:

> The implied covenant of good faith does not allow for a claim separate and distinct from a breach of contract claim. Rather, a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself.

Pym v. Einstein Practice Plan, Inc., No. 003577, 2004 WL 2439241, at * 1 (Pa. Ct. Cmn. Pl. July 21, 2004) (where claim for breach of contract fails, so does a claim for breach of the covenant of good faith and fair dealing) (emphasis added); Kimberg v. University of Scranton, No. 3:06cv1209, 2007 WL 405971, at * 4 (M.D. Pa. Feb. 2, 2007) (a duty of good faith may not be imposed where "a plaintiff has an independent cause of action to vindicate the same rights with respect to which the plaintiff invokes the duty of good faith"); Comcast Spectator L.P. v. Chubb & Son, Inc., No. 05-1507, 2006 WL 2302686, at * 19 (E.D. Pa. Aug. 8, 2006).

Accordingly, IFS' claim for a breach of the covenant of good faith and fair dealing must fail as a separate and independent cause of action. Associates, Inc. v. Harleysville Ins. Co., No. 000557, 2006 WL 1235978, at * 4 (Pa. Ct. Cmn. Pl. May 3, 2006) (Pennsylvania law does not "recognize a claim for breach of covenant of good faith and fair dealing as an independent cause of action separate from the breach of contract claim"). It is well-established under Pennsylvania law that "[t]here may be an express or implied covenant of good faith and fair dealing under any

contract between parties, but if so, its breach is a breach of contract, rather than an independent breach of a duty of good faith and fair dealing." Engstrom v. John Nuveen & Co., Inc., 668 F. Supp. 953, 958 (E.D. Pa. 1987) (acknowledging dismissal of a claim for breach of the covenant of good faith and fair dealing). Therefore, at trial, PNC will request that this court dismiss IFS' claim for breach of the covenant of good faith and fair dealing, as it "cannot serve as the basis for a separate cause of action." Drelles v. Manufacturers Life Ins. Co., 881 A.2d 822, 830 (Pa. Super. Ct. 2005).

**3. Misappropriation and Breach of Confidentiality (Count IV)**

In Count IV of the Complaint, IFS alleges that "PNC misappropriated proprietary products and technology, and wrongfully used confidential information that it received in connection with the Independent Advantage program." In order to prevail on its claim for misappropriation and breach of confidentiality obligations, IFS must first establish the existence of protectible confidential information, and the existence of a confidential relationship between the parties. Den-tal-ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1227-28, (Pa. Super. Ct. 1989). IFS must then establish three key elements:

> (1) plaintiff has made a substantial investment of time, effort and money into creating the thing misappropriated such that the court can characterize that thing as a kind of property right, (2) the defendant has misappropriated the thing at little or no cost, such that the court can characterize defendant's own actions as reaping where it has not sown, and (3) the defendant has injured plaintiff by the misappropriation.

Babiarz v. Bell Atlantic-Pennsylvania, Inc., No. 1863, 2001 WL 1808554, at * 8 (Pa. Ct. Cmn. Pl. July 10, 2001). Only if these elements are established, and if IFS can prove that PNC disclosed or used the allegedly confidential, proprietary information in such a way as to

constitute "a breach of confidence reposed in [it] by the other," can PNC be held liable. Pestco, Inc. v. Associated Products, Inc., 880 A.2d 700, 705 (Pa. Super. Ct. 2005).

IFS asserts that its misappropriation claim stems not from common law, but instead from "PNC's breach of its promises under the Agreement." (See Objection of Plaintiff Independent Financial Services, Inc. to Defendant PNC Bank, N.A.'s Motion for Summary Judgment at 7.) PNC agrees that Section 8 of the Agreement covers "Confidential Information." PNC does not agree, however, that Count IV of the Complaint falls under the specific terms of the Agreement. Were Count IV merely an allegation that PNC had breached a provision of the Agreement, it rightfully would fall under Count I for breach of contract, and could not stand alone. IFS would not be entitled to proceed on it as a separate cause of action.

Regardless of whether the misappropriation claim is viewed as a separate cause of action, or falls under the umbrella of IFS' claim for breach, PNC intends to establish at trial that IFS' claims are not supported by the evidence, and that IFS has suffered no harm as a result of any alleged misappropriation. Furthermore, PNC will reassert its argument that IFS' misappropriation claim is barred by the applicable statute of limitations. If viewed strictly as a breach of contract claim, the applicable statute of limitations would be the four-year limit applied under Pennsylvania law to contract actions. See 42 Pa.C.S. § 5525(8). On the other hand, if viewed as a stand-alone, common-law claim for misappropriation, it is subject to the two-year statute of limitations applicable to misappropriation actions. See 42 Pa.C.S. § 5524; Patient Transfer Systems, 2001 WL 936641, at * 15 (citing Advanced Power Sys., Inc. v. Hi-Tech Sys. Inc., 801 F. Supp. 1450, 1455 (E.D. Pa. 1992)).

Here, IFS did not bring its claim for misappropriation until April 30, 2005, which is more than four years after the date on which PNC provided notice of termination. IFS has not

presented competent evidence of any relevant conduct by PNC that occurred after notice of termination of the Agreement was provided on March 2, 2001, nor does PNC believe that IFS will be able to do so. Thus, under both the four and two-year statutes of limitation, IFS' claims must fail, unless IFS can produce evidence of conduct constituting misappropriation that occurred within the applicable time-frame prior to IFS' filing of its claim.

**4. IFS' Claim for Damages and its Proposed Expert on Lost Profits**

In its Complaint, IFS seeks "compensatory damages in an amount to be proved at trial, an amount IFS believes to be in excess of $10 million," punitive damages,[9] and attorneys' fees and costs. In its interrogatory answers, IFS more specifically details its theory of damages as being one for lost profits. Specifically, IFS claims lost profits where "PNC's breach denied IFS the benefit of its contractual bargain and prevented IFS from reaping the benefit of its substantial investment in time and money." (See IFS' Answers to Interrogatories, at No. 15). Since that time, IFS has designated an expert witness, Mark Filler, CPA, from whom it intends to present testimony at trial concerning IFS' claim for damages. Mr. Filler purports to opine that IFS' lost profits damages are in the amount of approximately $8.5 million. For reasons set forth below, and to be addressed in an appropriate motion in limine to be filed with this Court, PNC respectfully submits that (1) IFS' damages theory must fail as a matter of law, and (2) the proffered testimony of IFS' damages expert is inadmissible because it is based upon inherently speculative and unreliable data and assumptions.

Under Pennsylvania law, damages for breach of contract are calculated to "put the aggrieved party as nearly as possible in the same position as she would have occupied had there

[9] In addition to the motion referenced herein challenging IFS' theory of lost profits, PNC will file an appropriate motion challenging the basis for any claim of punitive damages, and asking this Court to prohibit any reference to punitive damages in the presence of the jury until or unless the Court makes an appropriate finding that IFS can satisfy the required threshold for such a claim. PNC respectfully submits that IFS cannot make, and will not be able to make, such a showing.

been no breach." Cook v. S. Walter Packaging Corp., 71 Pa. D & C. 4th 383, 392-93 (Pa. Ct. Cmn. Pl. Feb. 8, 2005) (citing Murray v. Univ. of Pa. Hosp., 490 A.2d 839, 843 (Pa. Super. Ct. 1985)). However, "damages are not recoverable if they are too speculative, vague or contingent and are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Spang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988) (citing Restatement (Second) of Contracts § 352). Nevertheless, "uncertainty as to the amount of damages will not bar recovery where it is clear that damages were the certain result of defendant's conduct." Spang & Co., 545 A.2d at 866 (citing Pugh v. Holmes, 405 A.2d 897 (Pa. 1979) (emphasis added)).

Pennsylvania law allows a plaintiff to recover lost profits damages for breach of contract only where: "(1) there is evidence to establish [lost profits] with reasonable certainty, (2) there is evidence to show that they were the proximate consequence of the wrong," and (3) the lost profits were reasonably foreseeable to the breaching party. Delahanty v. First Pa. Bank, N.A., 464 A.2d 1243, 1258 (Pa. Super. Ct. 1983). A plaintiff may not recover lost profits damages where they are merely speculative. Delahanty, 464 A.2d at 1258. Alleged lost profits are deemed speculative where the evidence is so "meager or uncertain as to afford no reasonable basis for inference." Merion Spring Co. v. Muelles Hnos. Garcia Torres, S.A., 462 A.2d 686, 696 (Pa. Super. Ct. 1983). Instead, Pennsylvania law requires evidence that "with a fair degree of probability establish[es] a basis for the assessment of damages." Exton Drive-In, Inc. v. Home Indem. Co., 261 A.2d 319, 324 (Pa. 1969).

IFS bears the burden of proof to establish lost profits. Delahunty, 464 A.2d at 1257. In order to establish its lost profits, IFS must introduce evidence "which forms a sufficient basis for estimating with reasonable certainty the amount of the lost anticipated profits." Id. at 1258



PRV_868026_1/MFREEL

(quoting Exton Drive-In, 261 A.2d at 323-25). In the context of a plaintiff's claim for lost profits, the "element of causation defines the range of socially and economically desirable recovery and requires not only 'but-for' causation, but also that the conduct be a substantial factor in bringing about the harm." Advent Sys. Ltd. v. Unisys Corp., 925 F.2d 670, 681 (3d Cir. 1991). Furthermore, evidence must be presented that is "sufficiently concrete to provide a reasonable degree of certainty that the verdict is more than the result of a lottery or emotional reaction . . .[p]redicting the results of business dealings that might have, but never did, occur is of course a difficult matter of proof." Id.

PNC submits that IFS has not presented sufficient evidence as a matter of law to support its lost profits theory. Despite having produced thousands of documents through the discovery process, IFS has failed to produce any documents or information sufficient to support its damages claim. IFS' multi-million dollar claim is inherently speculative, as it is based on unsubstantiated and purely aspirational expectations of future loan generation and agency participation -- none of which IFS was ever able to achieve in dealing with at least five (5) different banks over a period of more than ten (10) years.

PNC also intends to challenge IFS' designated expert on damages, on both procedural and substantive grounds. Despite ample opportunity during the discovery phase of this trial, IFS disclosed Mr. Filler as its expert on March 12, 2007, long after the close of discovery. PNC has been told that its counsel cannot depose Mr. Filler until April 24, 2007. Filler's expert report states a conclusion that "the amount of economic loss suffered by the plaintiff, [IFS] is the rounded amount $8,565,000." To reach his conclusion, Filler apparently has reviewed only a limited number of documents, including the pleadings in this case, his discussions with Richard Herriott, the Agreement itself, IFS' business plan, IFS' financial statements for the years 1998,

1999, and 2000, and an unrelated SEC filing. Filler's calculations as to forecasted lost profits are purely speculative, and unsupported by any hard data upon which Filler could base a legitimate projection, consistent with the applicable law.

Despite Filler's purported expertise and background in accounting, he cannot turn the subjective expectations of IFS and Richard Herriott into competent evidence simply by declaring them to be so. Rather, Filler's calculations are mere conjecture, and not backed up by necessary facts or reliable data. Expert testimony that is vague, conclusory, and evasive may not be admitted. See e.g., Sunlight Saunas, Inc. v. Sundance Sauna, Inc., 427 F. Supp. 2d 1022, 1030 (D. Kansas 2006). Nor may mathematically accurate, yet unsound and unreliable, calculations be admitted into evidence. See id. at 1031. The record in this case simply does not support Filler's proffered testimony, his methodology, or the ultimate conclusions he reaches. Accordingly, PNC intends to challenge the admissibility of Filler's testimony by way of a motion in limine.

## III. EXHIBITS

Pursuant to this Court's Pretrial Order dated April 3, 2007, PNC shall consult with opposing counsel and file a joint list of trial exhibits on or before April 24, 2007.

## IV. EXPERT WITNESSES

PNC does not currently anticipate presenting testimony at trial from any expert witnesses. As set forth above, PNC reserves the right to object to the admissibility of any expert witnesses or opinions offered by IFS, on grounds to be set forth in an appropriate pretrial motion in limine.

## V. JURY INSTRUCTIONS

PNC's proposed jury instructions will be filed separately, in advance of any trial in this action, or as further ordered by this Court.

## VI. LENGTH OF TRIAL

PNC currently anticipates that this jury trial will last approximately six (6) to eight (8) trial days.

PNC BANK, N.A

By its Attorneys,

/s/ Mark W. Freel

Mark W. Freel (#4003)
Raymond M. Ripple (#6489)
EDWARDS, ANGELL PALMER
& DODGE, LLP
2800 Financial Plaza
Providence, RI 02903
(401) 274-9200 (Phone)
(401) 276-6611 (Fax)
mfreel@eapdlaw.com
rripple@eapdlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of April 2007, I caused a true copy of the within Pretrial Memorandum to be delivered electronically to:

Jeffrey C. Schreck, Esq.
99 Wayland Avenue
Suite 200
Providence, RI 02906-4314

/s/ Mark W. Freel