UNITED STATES DISTRICT COURT]
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| INDEPENDENT FINANCIAL SERVICES, INC., Plaintiffs, | ) | |
| v. | ) | C.A. NO. 05-275-ML |
| PNC BANK, N.A., f/k/a PNC BANK, F.S.B., Defendant. | ) | |

**PLAINTIFF'S PRETRIAL MEMORANDUM**

I. Facts That Plaintiff Expects To Prove:

During the mid-to-late 1990's, plaintiff Independent Financial Services, Inc. ("IFS") devised a simple and comprehensive loan origination program that would allow insurance agencies to offer their customers on a competitive basis a wide variety of financial products and services. Consumer and commercial loans were the principal financial products offered by IFS. IFS called its loan origination program the *Independent Advantage*® program and launched this loan origination program in 1998.

The *Independent Advantage*® program allowed IFS member insurance agencies to secure fast loan decisions and competitive loan rates without substantially increasing business overhead. IFS had loan program agreements with more than 400 insurance agencies throughout the United States and had agreements with agency groups that allowed IFS to provide financial services to their member insurance agencies and the agency customers. IFS invested money and over seven years in market research, technological innovation, systems development, and test marketing in order to create the loan products and services that it offered as the *Independent Advantage*® program that

enabled insurance agencies to effectively compete in the marketplace with banks and other financial institutions on a national basis.

In mid-1997, IFS and IFS Mortgage Services LLC, Inc. ("IFSMS"), met with representatives of defendant PNC Bank, F.S.B. (now PNC Bank, N.A.) ("PNC") and negotiated the terms of an exclusive loan program. IFS and IFSMS signed a Financial Services Agreement dated February 27, 1998 (the "Agreement") with PNC. The initial term of the Agreement was 10 years and PNC agreed to make various kinds of loan products and services available to IFS member agencies. IFS invested in excess of $1,800,000 in equity and debt after the Agreement was executed in order to make the *Independent Advantage*® program successful.

PNC failed to make a good faith effort to deliver to IFS and its member agencies the loan products and services PNC promised. PNC also failed to approve loans that satisfied applicable loan standards. PNC took other actions that displeased member agencies, such as trying to cross-sell other PNC products in violation of the Agreement. PNC also pushed IFS and member agencies to purchase expensive computer printers and related equipment. PNC's actions undermined the agencies' faith in the *Independent Advantage*® program and their interest in making the program available to their customers, in addition to harming IFS and the agencies financially and making it more difficult for IFS to satisfy its obligations under the Agreement.

On March 2, 2001, PNC sent a notice terminating the Agreement effective April 30, 2001 because of the alleged failure of IFS to have at least 400 loans or lines of credit on PNC's books on any business day within the first 36 months of the Agreement. IFS and PNC disagree as to the meaning of the termination provision that PNC relied upon to

terminate the Agreement. IFS contends that the Agreement required only 400 or more loans in total on the books on any given day during the first 36 months; PNC contends that there had to be a particular day on which 400 or more loans were booked. If IFS is correct, then PNC's termination clearly breached the terms of the Agreement and entitles IFS to damages.

Although the loan program grew throughout the IFS-PNC relationship, the growth was not as rapid as the parties had hoped. For the above reasons and related causes that IFS will explain at trial, PNC's actions were a substantial part of the slower than expected development. Despite PNC's actions and inactions that interfered with development of the *Independent Advantage*® program in accordance with the parties' expectations, IFS performed its obligations in accordance with the requirements of the Agreement and PNC should not have terminated its relationship with IFS.

PNC's actions breached the Agreement and constituted a breach of their obligation to act in good faith and engage in fair dealing with IFS. PNC also misappropriated information it received from IFS and sought to use that information outside the program to PNC's benefit.

II. Fact Witnesses And Expert Witness:

This information has been submitted under separate cover to the Court.

III. Supporting Law:

This case involves fairly basic principles of law. Plaintiff IFS contends that defendant PNC breached the Agreement between the parties and that PNC's conduct violated its obligation of good faith and fair dealing toward IFS. IFS seeks compensatory damages that reflect the profits that IFS would have earned if PNC had not breached the

Agreement. In addition, IFS alleges that PNC misappropriated certain financial and proprietary information belonging to IFS. Under the terms of the Agreement, the law of the Commonwealth of Pennsylvania governs the relationship of the parties.

A. Breach of Contract:

Under Pennsylvania law, loss of profits may be recovered in a contract action if there is (1) evidence to establish the damages with reasonable certainty; (2) they were the proximate consequence of the wrong; (3) they were reasonably foreseeable. Delahanty v. First Pennsylvania Bank, N.A., 318 Pa. Super. 90, 464 A.2d 1243, 1258 (Pa. Super. 1983). Proof of damages need not be mathematically precise, but the evidence must establish the fact "with a fair degree of probability." Exton Drive-In, Inc. v. Home Indemnity Co., 436 Pa. 480, 261 A.2d 319, 324 (1969), *cert. denied*, 400 U.S. 819, (1970).

An award to a business that does not have a history of profits may be made "where such a loss was reasonably foreseeable to the parties at the time that the contract was entered and where those damages are capable of proof of reasonable certainty." Advent Sys. v. Unisys Corp., 925 F.2d 670, 681 (3d Cir. 1991), quoting General Dynafab, Inc. v. Chelsea Industries, Inc., 301 Pa. Super. 261, 447 A.2d 958, 960 (Pa. Super. 1982). In that case, although arguably a newcomer to the business, plaintiff was able to show that "there was significant interest in [its] product before the contract breach occurred," as manifested by commitments for orders from four sources. Id. *National Controls* emphasizes the need for evidence sufficiently concrete to provide a reasonable degree of certainty that the verdict is more than the result of a lottery or

emotional reaction. Predicting the results of business dealings that might have, but never did, occur is of course a difficult matter of proof.

In addressing proof of damages in National Controls Corp. v. National Semiconductor Corp., 833 F.2d 491, 496 (3d Cir. 1987), the Court pointed out that it is necessary to consider the fact that the "damages sought must be a proximate consequence of the breach, not merely remote or possible . . . ". The element of causation defines the range of socially and economically desirable recovery and requires not only 'but-for' causation in fact but also that the conduct be a substantial factor in bringing about the harm."

When a business has become established, the Pennsylvania Supreme Court has mentioned several methods of proof to establish prospective loss profits: (1) evidence of past profits; (2) profits made by others or by similar contract where the facts were not greatly different; (3) testimony of experts if based on anything more than individual opinions or conjecture. Massachusetts Bonding & Ins. Co. v. Johnston & Harder, Inc., 343 Pa. 270, 22 A.2d 709, 714 (1941).

In this case, IFS can show that its business was steadily increasing in volume, and that as a consequence it would have made substantial profits if PNC had not prematurely terminated the Agreement.

B. Good Faith And Fair Dealing:

The Pennsylvania Superior Court has concluded that in the absence of any express language the law will imply an agreement by the parties to do those things that "according to reason and justice they should do in order to carry out the purposes for which the contract was made and to refrain from doing anything that would destroy or

injure the other party's right to receive the fruits of the contract." Advent Systems, 925 F.2d at 680, quoting Slater v. Pearle Vision Center, Inc., 376 Pa. Super. 580, 546 A.2d 676, 679 (Pa. Super. 1988). *See Restatement (Second) of Contracts* § 205 (1979). The Court in Advent Systems cited one commentator's observation that when a contract does not have a "best efforts" clause, "the law will usually imply . . . that the dealer must act in good faith and use 'reasonable efforts' to sell. This implied obligation requires the distributor to do more than the bare minimum to comply with a contract; the distributor must really make some attempt to sell." Banks, *Distribution Law* 226-27 (1990).

In Creeger Brick & Bldg. Supply, Inc. v. Mid-State Bank and Trust, 385 Pa. Super. 30, 560 A.2d 151 (Pa. Super. 1989), the Pennsylvania Superior Court explained the legal concept of "good faith" with regard to the law of contracts in the following fashion:

Section 205 of the Restatement (Second) of Contracts suggests that "every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." A similar requirement has been imposed upon contracts within the Uniform Commercial Code by 13 Pa. C.S. § 1203. The duty of "good faith" has been defined as "honesty in fact in the conduct or transaction concerned." ***See***: 13 Pa. C.S. § 1201; Restatement (Second) of Contracts § 205, Comment a. Where a duty of good faith arises, it arises under the law of contracts, not under the law of torts. AM/PM Franchise Association v. Atlantic Richfield Co., 373 Pa. Super. 572, 579, 542 A.2d 90, 94 (1988); [see also] Clay v. Advanced Computer Applications, Inc., 370 Pa. Super. 497, 505 n. 4, 536 A.2d 1375, 1379 n. 4 (1988), allocatur granted, 518 Pa. 647, 544 A.2d 959 (1988).

A bank borrower may plead sufficient facts to make out a claim that a lender violated its general duty of "good faith" arising out of the law of contracts. See, e.g., Corestates Bank, N.A. v. Cutillo, 1999 Pa. Super 14, 723 A.2d 1053 (Pa. Super. 1999). See, also, Cable & Assocs. Ins. Agency v. Commercial Nat'l Bank of Pa., 2005 Pa. Super 186, 875 A.2d 361 (Pa. Super. 2005).

In this case, IFS will prove that PNC's lack of support and failure to live up to its promises and obligations constitutes a breach of the covenant of good faith and fair dealing.

C. Misappropriation And Breach Of Confidentiality Obligation:

Where there is a relationship of trust between parties and the communication of confidential information that is not to be used by the receiving party outside of the parties' relationship, the law provides that it will protect the party that provided the confidential information. See, e.g., Den-Tal-Ez, Inc. v. Siemens Capital Corp**.,** 389 Pa. Super. 219**,** 566 A.2d 1214 (Pa. Super. 1989).

Pennsylvania cases involving common law causes of action for misappropriation of trade secrets frequently present factual settings including the existence of a confidentiality agreement between the parties. For example, in Air Products and Chemicals, Inc. v. Johnson, 296 Pa. Super. 405, 442 A.2d 1114 (Pa. Super. 1982), the Superior Court specifically commented on the relevance of the confidentiality agreement to the tort action. The court stated that the agreement constituted evidence of the existence of a confidential relationship between the parties, which is an often important factor under common law in the analysis of whether a party is entitled to protection against the use or disclosure of its trade secrets or confidential information. Id., 442 A.2d at 1118 n7.

In this case, IFS alleges that PNC used its agency customer information to sell other bank products, and PNC also used misappropriated proprietary products and technology developed by IFS.

IV. Exhibits:

In accordance with the Court's Pretrial Order of April 3, 2007, IFS and PNC will consult and file a joint list of trial exhibits on or before April 24, 2007.

V. Jury Instructions:

The proposed jury instructions will be filed separately in advance of any trial in this action.

VI. Length Of Trial:

Plaintiff estimates that the trial will take 5 to 6 days.

/s/ Jeffrey C. Schreck___________________
Jeffrey C. Schreck (#2428)
99 Wayland Avenue, Suite 200
Providence, RI 02906
TEL (401) 421-9600
FAX (866) 587-1527
Attorney for Plaintiff